UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| MATT NASUTI,<br><br>  Plaintiff,<br><br>vs.<br><br>WALMART, INC.,<br><br>  Defendant. | 5:20-CV-5023-LLP<br><br>MEMORANDUM OPINION AND ORDER<br>ON MOTIONS FOR SUMMARY<br>JUDGMENT |

Plaintiff Matt Nasuti ("Nasuti") has filed a renewed motion for summary judgment. (Doc. 93.) Defendant Walmart, Inc. ("Walmart") has also moved for summary judgment. (Doc. 95.) The parties have fully briefed the issues, and the Court gave the parties an opportunity to present argument at a motion hearing on October 13, 2021. For the reasons stated below, Nasuti's motion is denied and Walmart's motion is granted.

## BACKGROUND

Viewing the facts in a light most favorable to Nasuti for purposes of Walmart's motion for summary judgment, the record establishes the following. On August 13, 2019, Walmart hired Nasuti to work as an assistant manager for Walmart's Spearfish, South Dakota store ("the Store"). Nasuti received a letter from Walmart that stated, in part: "This offer is conditioned upon your agreement to accept the position. This offer letter does not create an express or implied contract of employment or any other contractual commitment. Your employment relationship with Walmart is on an at-will basis, which means that either you or Walmart may terminate the employment relationship at any time for any or no reason, consistent with applicable law." (Doc. 96-15.) Nasuti signed the letter. (*Id.*)

Nasuti began working in August of 2019. He attended Walmart's Academy for Managers in Colorado for six weeks. Nasuti was in training in Colorado when he filed a complaint about being retaliated against by the training manager after reporting a safety violation. Walmart's

investigation found that Nasuti had raised valid safety concerns, but that he had not been retaliated against.

In his declaration filed in opposition to Walmart's motion for summary judgment, Nasuti says that, during his time at the Store, store manager, Corey Heiting ("Heiting"), treated at least three women abusively, illegally and in violation of Walmart policy. (Doc. 98 at ¶ 30.) At his deposition, Nasuti testified that several of his female co-workers suffered unfair treatment because Heiting "treated women different than men." (Nasuti depo. at 23:19-24:4.) Three of the women are Martha McMannis ("McMannis"), Jean Larsen ("Larsen") and Tammy Brothern ("Brothern"). (*Id.* at 24:3-4.) Nasuti also described female assistant managers quitting "in part because they weren't being treated properly." (Nasuti depo. at 24:12-18.) He explained that no male assistant managers quit. Rather "[i]t was only females. So you can do the statistics. There was a problem there." (*Id.*)

Regarding McMannis – the store personnel manager – Nasuti testified that Heiting "would always talk behind her back," and "[w]hen she would raise questions, he'd roll his eyes." According to Nasuti, Heiting would sometimes criticize McMannis for not doing her job well— for example, "nitpicking about schedules [not being] correct for this particular person or that particular person." Nasuti also thought McMannis was treated abusively, illegally and in violation of Walmart policy because Heiting once "riled against her" at a meeting, and "said he wasn't going to give her an exceeds performance evaluation." McMannis never complained to Nasuti that she thought she was being treated unfairly, nor did anyone else express that view to him. Nasuti never told Heiting that he thought McMannis was being mistreated. Nasuti disagreed with Heiting's criticisms of McMannis, and Heiting's purported poor opinion of McMannis's job performance. On one page of his deposition, Nasuti said it "appeared to be all gender related." (Nasuti depo. 32:1.) Walmart did not provide the Court with the previous page of Nasuti's deposition, so the question Nasuti was responding to is unknown.

Larsen worked as a department manager for stationery and office supplies. According to Nasuti, Larsen struggled to perform well in her role, because she had difficulty lifting items and was "over her head." Nevertheless, Heiting refused to move her to a different department, and would refuse to discuss with Nasuti the topic of moving Larsen. Nasuti does not know whether Larsen suffered from a disability, or whether she ever asked for an accommodation. Nasuti thought

that "it made no business sense" for Heiting to decline to move Larsen to a different department. Nasuti stated at deposition that Heiting would talk about male department supervisors and moving them" but he did not want to talk about moving Larsen. It was Nasuti's view that Heiting "was talking strictly about her [Larsen's] gender or that he had a personality issue with her. I'm not sure, one or the other." (Nasuti depo. 33:20-25; 34:1.) Nasuti testified further: "With a male -- With a male associate, a similarly situated male associate, he was very eager to move them because he wanted them to be effective, he wanted them to -- to grow, he wanted the store to do well. But with females he didn't care." (*Id.* at 34:16-20.)

Brothen was in charge of the liquor department. Nasuti recommended to Heiting that Brothen be moved to a different department. At Nasuti's urging, after months of effort, Heiting moved Brothen to run the pharmacy department. Nasuti thinks Brothen should have been transferred sooner, and that Heiting kept her in the liquor department position despite knowing that Brothen was "in pain." Brothen suffers from carpal tunnel syndrome and wore braces on her wrists. Nasuti is not aware of Brothen ever making a formal request for an accommodation, and never himself recommended to her that she ask for an accommodation, even though it was part of his job to tell associates whom he thought needed a disability accommodation how to seek one out.

During Nasuti's employment, Walmart had a number of policies including a Global Statement of Ethics, a Disciplinary Action Policy, Disciplinary Action Management Guidelines, an Open Door Communications Policy, and a Discrimination & Harassment Prevention Policy. All of these policies included language indicating that they do not create an express or implied contract of employment or any other contractual commitment, and that employment with Walmart is on an at-will basis. (Docs. 96-18, 96-19, 96-20, 96-21, and 96-22.) Nasuti attached to his declaration copies of both the Open Door and Disciplinary Action policies that were given to him by Walmart. Nasuti doesn't deny that the policies include language that employment with Walmart is at-will, but he says the "at-will" language is "difficult to impossible to read." (Doc. 100, pp. 6-7.) At deposition, Nasuti was asked: "Are you aware of any document at Walmart that said it had to have cause to terminate your employment? He responded: "Not those specific words." (Nasuti depo. at 89:19-22.)

Nasuti contends that Walmart has a personnel manual or an equivalent, but Walmart's Market Human Resources Manager submitted a declaration averring that Walmart has not had a personnel manual since the 1990s and instead uses various policies online as described in this paragraph. (Doc. 82-3.) Nasuti cites no evidence to support his assertion that Walmart withheld a personnel manual. At deposition, Nasuti was asked: "Q: Did you have a written contract with Walmart for a particular term of employment? A: I had a written contract which is the personnel manual. Q: Okay. Anything else? A: No." (Nasuti depo. at 94:9-15.)

On January 10, 2020, Heiting had a conversation with Nasuti (which co-manager Josh Hehn witnessed, following which Heiting recorded in writing his impressions). (Doc. 96-25, Declaration of Heiting.) Heiting's impressions included that Nasuti "needed attendance at management tours and meetings, helping answer management calls, and [Heiting]challenged him on building relationships with the team to assist." (Doc. 96-26.) Heiting recorded that Nasuti was "[e]xtremely defensive and upset" by this, and responded by "challenging every bit of feedback that he receives." (Id.) At his deposition, Nasuti said that "there was nothing to change" about his workplace behavior after the meeting with Heiting on January 10, 2020. (Nasuti depo. 129:10-16.)

On February 1, 2020, Heiting had another conversation with Nasuti, for which Heiting also took notes. Heiting recalled that he and co-manager Manny Schryvers talked "with Matt about his tours, building relationships, and his desire/drive to be an [assistant manager] for us." (Doc. 96-26.) Heiting "[m]entioned the perception is that [Nasuti] does not want to be here," and set "[e]xpectations of his tours and our direction moving forward." (Id.) At deposition, Nasuti testified that he remembered this meeting, and recalled Heiting saying "we don't think that you're happy," which Nasuti thought was "just really creepy" and "a weird thing to say." (Nasuti depo. 122:24-123:1.)

On February 3, 2020, Nasuti, at the direction of one of his supervisors, co-manager, Manny Schryvers, emailed Heiting to express his concerns about Tom Ferguson ("Ferguson"), a fellow male assistant manager who worked an overnight shift. (Doc. 96-3.) Nasuti claimed that Ferguson had been "abusive" to another associate, causing this associate to cry. Nasuti also took issue with Ferguson's management of other associates. Nasuti was also concerned about a comment Ferguson made about how certain pallets needed to "be removed from 'his backroom.' " Nasuti

4

stated that Ferguson "needs to be advised that the backroom is not his." In this email, Nasuti recounted what he perceived to be Ferguson's inadequate job performance, and he stated that "[i]n my opinion he is not a good fit for Overnights. He overreacts in January when it is slow. Once it gets busier, he will get worse." (*Id.*)

Heiting subsequently discussed this email with Nasuti in a meeting that was also attended by co-manager Manny Schryvers. Heiting told Nasuti that it was not appropriate for him to say that Ferguson was a poor fit for a manager on the overnight shift. At deposition, Nasuti was asked if Heiting told him during the meeting that he had the obligation to build relationships with his coworkers. Nasuti responded, "I don't know if he specifically said that. I informed him that my first obligation is to protect store employees from abuse, that that's my primary objective." (Nasuti depo. 105:1-4.)

Shortly after his meeting with Heiting and Schryvers on February 3, 2020, Nasuti sent a text message to co-manager Schryvers, stating:

> Manny, You specifically advised me to email Corey about the two Tom incidents and then you did not defend me last nite. You will have to live with that. Corey attacked me for giving him news that he did not want to hear. He should have zero tolerance for manager abuse, but unfortunately that is not the case. Abusive managers are not part of my team. Since he retaliated against me, you are obligated to report such up the chain. You also need to protect yourself. Tom's stress level will only increase. For some people it is only a short jump from verbal abuse to physical. Corporate policy is to take preemptive action. Everything I have done complies with home office direction. It is also in Tom's best interest. Moving him to a less stressful slot is a simple fix. You know I am right. I will be responding to Corey in detail tomorrow and will be meeting with Ardie on the 25th. This is all fixable. Best regards, Matt.

At deposition, Nasuti was asked if he changed his behavior after the discussions he had with Heiting on February 1 and February 3, 2020. Nasuti responded, "No, those discussions were all pretext, and therefore, I was going to continue to comply with corporate policy." (Nasuti depo. 129:23-25.)

On February 5, 2020, Nasuti sent an email to Heiting stating:

> Lets recap the retaliatory meeting you mandated on Monday night [i.e., the February 3 meeting between Heiting and Nasuti].
>
> Monday afternoon I briefed Manny Schryvers about the two incidents I had with Tom Ferguson. Manny specifically advised me that the right thing to do was to put all of

the details of the two incidents into an e-mail and send such to you. I did so and then you called me into a meeting and proceeded to attack me. You react to bad news with a lot of hostility toward the messenger. That is misplaced.

You claimed that the Tom matter had been addressed, but new incident #2 clearly revealed that you had not dealt effectively with the problem. Everyone occasionally makes mistakes and you need to own yours, and then fix the mistake. That is the only way to move forward. Your attacks against me are unacceptable and contrary to company policy. Wal-Mart encourages feedback and a free exchange of concerns up the chain, especially in cases of abuse. You cannot build a cohesive team without an open dialogue. For reasons unknown, you lately have turned every discussion into a strange adversarial proceeding. That is not our process. That was not the first e-mail I sent you detailing serious store problems which you ignored and refused to discuss with me. . . .

Your "criticism" of me in which you equated my reporting of Tom's abuse as being just as "unprofessional" as Tom's abuse, was so ridiculous that I had no response.

You need to have zero tolerance toward abusive managers and toward manager dishonesty (previous e-mail), and you need to cease retaliating against those who forward bad news to you. It is as simple as that. . . .

My advice to you was in complete conformance with corporate policy. Why you are not jumping on this, defusing the situation and moving him to another less stressful slot is perplexing. It is a simple fix. You don't seem to grasp the fact that I am also acting in Tom's best interests.

I view your management style as forcing people to act as a team, while mine is molding a team. Bullying people into silence is not team-building but that has lately been your tactic (and Tom's). Management-by-force is occasionally necessary, but you are mis-employing it against me and others such as Jeannie. In her instance you have counter-productively misused your authority in order to harm her and our company. You need to re-think your actions toward her also. . . .

One solution is to put the right people in the right positions. Those who (for various reasons) should move include Tom, CAP 2 Corey, Jeannie and others. The round pegs should be moved into the round holes. If you do such molding, the whole system functions smoothly. You are a smart guy. You need to take control of these situations.

As a result of all of this, I have asked to visit with [Market Manager] Ardie [Wardell] and he has tentatively agreed to meet on February 25th when he is next in Spearfish. You are welcome to attend as I have no secrets. I advised Ardie that I was "perplexed" by your strange recent meetings with me. I have not provided him with the specifics yet.

As this year progresses, we face a lot of new stresses on the workforce and higher metrics/goals that we will be expected to meet. I am completely convinced that we can soar through all of this, but we have to work together in a cohesive team.

I should not have had to turn to Ardie for solutions, but you left me no choice. This should not have to fall on me – your CO's [co-managers] should be doing this, but it is what it is.

In the interim, it is best if I "call in" until February 25th. Your actions are improperly forcing me to use up all my PTO for the year, which is unfortunate.

Best Regards,

Matt

(Doc. 96-5.)  The "new incident #2" referenced in the email related to Nasuti's belief that Ferguson had "another blow up . . . against the night staff" sometime between February 3 and February 5, 2020. (Nasuti depo. 108:21-109:3.)

Nasuti testified that he took maybe seven to ten days off after the email he sent to Heiting on February 5, 2020, in order to let Heiting "cool off" until Nasuti could talk to Ardie Wardell. (Nasuti depo. 113-114.)

On February 14, 2020, Nasuti received a performance evaluation. Nasuti's overall performance rating was "below expectations."

On February 18, 2020, Nasuti sent a six-page email to Julie Murphy, Walmart's Executive Vice President and Chief People Officer, and Lance Lanciault, Walmart's Senior Vice President and Chief Ethics and Compliance Officer.  (Doc. 96-11.)  In addition to complaining about Ferguson and co-manager Josh Hehn, Nasuti complained about Heiting's treatment of two female employees, labeling it "abusive conduct."  In his declaration filed in this case on August 30, 2021, Nasuti describes his complaints as raising "gender discrimination, safety, health and other violations of law and Wal-Mart policy, including illegal retaliation." (Doc. 98, Nasuti declaration, p. 7.)

Nasuti's February 18, 2020 complaint was treated as an Open Door communication, and it was assigned to an associate case manager named David Hinton ("Hinton") to investigate.  Hinton contacted Nasuti, both via email and telephone.  (Doc. 96-30.)  Nasuti told Hinton in an email on March 4 that the "Ethics Office" was refusing to talk to him, and that Nasuti was "pursuing alternative avenues to fix all of this and protect all the victims at my store, and hopefully fix a broken WalMart." (*Id.*)

Nasuti's February 18, 2020 complaint also was treated as an Ethics complaint, and assigned to an associate named Kristi Yarnall ("Yarnall"), Case Manager II (Associate Relations).  Lance Lanciault emailed Nasuti and told him that he assigned the complaint to an Ethics Team.  (Doc. 98, Nasuti declaration, p. 10.)  During February 2020, Nasuti spoke to Yarnell by telephone and exchanged numerous emails with her.  (*Id.*)  Nasuti disagreed with Yarnell conducting her investigation by telephone and by Zoom.  (*Id.* at pp. 10-11.)  Yarnall never communicated the results of her investigation to Nasuti.  (*Id.* at p. 11.)

Yarnall interviewed eight individuals (including Nasuti's supervisors, and Larsen and Brothen), and reviewed documents relevant to Nasuti's allegations.  (Doc. 96-32, Report of Investigation.)  Yarnall's Report of Investigation dated April 23, 2020, summarized the issues as follows:

> On February 18, 2020, MATT NASUTI, former Assistant Store Manager (ASM), wrote an Executive Open Door (EOD) letter and reported the following ethics allegations:
>
> 1. **Compliance - Other** - COREY HEITING, Store Manager, did not move TAMMY BROTHEN, Over the Counter (OTC) Department Manager, from the Liquor Department for six months after Heiting knew Brothen worked in pain.
>
> 2. **Discrimination - Gender** - Heiting refused to move JEAN LARSON, Fabrics and Crafts Department Manager, even though she felt overwhelmed, but moved her male peer, CG, Frozen Department Manager, to a smaller area.
>
> 3. **Retaliation** - Heiting rated Nasuti "Below Expectations" on his annual performance rating and gave Nasuti a Disciplinary Action (DA) Orange out of retaliation after Nasuti reported concerns to Heiting.

(Doc. 96-32.)  Yarnall's report states that she tried to set up an interview with Nasuti, but Nasuti declined to participate in the interview process.  (Doc. 96-32, p. 4.)  Nasuti points out that Yarnall sent an email on March 2, 2020 stating that "we are ceasing communication with this reporter [Nasuti]."  (Doc 98-6.)  Yarnall's investigation ended with a finding that Nasuti's allegations were unsubstantiated.

On February 22, 2020, Nasuti lodged a complaint about his poor performance evaluation, alleging that it was "clearly retaliation for my efforts over the past several months to convince my store manager to act ethically toward several male and female associates."  (Doc. 96-33.)

There is a document attached as Exhibit 3 to Nasuti's declaration which Nasuti refers to as a copy of one of his "Corporate Complaints."  (Doc. 98, Nasuti declaration, p. 7; Doc. 98-3, Exhibit

8

3.)  The document is entitled "Retaliated Against for Contacting You."  It is signed by Nasuti but it does not show to whom it was sent, nor does it include a date.  In Exhibit 3, Nasuti asserts that his poor performance evaluation was retaliatory, he complains about Wardell refusing to approve paid time off, and he states that he is expanding his request to include "that you review cleaning house at the store and at the market."  In a note after his signature on Exhibit 3, Nasuti described Heiting's treatment of a female employee in the HR department.  Nasuti explained how hard the HR employee worked and what an excellent job she did.  Then he stated:

> Despite that, Store Manager Heiting has nothing good to say about her.  At our evaluation meeting last month, he berated her behind her back and insisted that she not receive an Exceeds, even though she deserves it.  Heiting would not explain his hostility toward her.  Marti is so nice that she will never contest her meets standards evaluation. This is Heiting's pattern, which applied even more abusively against the two female DMs I wrote to your [sic] about.

(Doc. 98-3, p. 2.)  Nasuti also said in Exhibit 3 that he "was recently told by one long-term female manager that one has to have a penis in this store to succeed."  (*Id.* at p. 1.)

Walmart's Disciplinary Action Policy prescribes three levels of written disciplinary action: yellow, orange and red. (Doc. 96-19.)  The Policy empowers an associate's manager to "determine the appropriate level of accountability to use depending on the individual situation," and allows a manager to skip levels of discipline "based on the circumstances." (*Id.*)  In general, yellow disciplinary action is awarded where the associate's misconduct had a "slight" impact on the store's operations; orange disciplinary action is awarded for "moderate" impact; and red disciplinary action for a "significant level of impact." (*Id.*)  Under Walmart's policy, if an associate receives a written disciplinary action and his or her job performance "remains unacceptable," the associate "may be terminated." (*Id.*)

On February 26, 2020, Heiting issued Nasuti an orange disciplinary action. (Doc. 96-6.) The orange disciplinary action stated:

> Matt has displayed job performance issues. Today Matt's response to what his Cap 1 team got completed today was "I didn't get the sheet from Sheila" is an example of this ongoing performance concern. This has been a consistent response and lack of follow up on his part over the past weeks with this responsibility.

The disciplinary action referenced Nasuti's obligations as a supervisor for one of the Store's CAP teams, which were responsible for moving merchandise from freight trucks onto the

shelves. The disciplinary action also referenced Nasuti's failure to complete a CAP sheet, a document that the CAP supervisor Sheila would leave for him to fill out. Nasuti denies that filling out the CAP sheet was his duty. (Doc. 100, p. 15.)

The orange disciplinary action had a section for Nasuti to leave a comment. Nasuti wrote:

> I have been attempting for months in meetings and emails to convince bullying Heiting to cease his abuse of several female associates. He has responded with increasing petty retaliation. The facts of his abuse are clear and will disturb any decent person. Heiting is not even smart about his retaliation. It is primarily vague smears. The current silly effort by him does not even read as an Orange. It is similar to my recent retaliatory evaluation. Nothing in it justifies a punitive rating. Heiting is aided by two weak Co-Managers.

> The action plan is in place, which is that all of this has been forwarded to Corporate. Heiting has no place in our Company, nor does anyone who is either closing their eyes to his misconduct, or aiding it. We need to protect our wonderful people from Heiting. Hopefully that will happen. Hopefully Corporate will be able to devise means of compensating Heiting's victims, and will be able to prevent any more victims.

(Doc. 96-6.)

The orange disciplinary action issued on February 26, 2020 required Nasuti to complete an "action plan" to set forth how he would improve. (Doc. 96-6.) Rather than complete an "action plan" to set forth how he would improve, Nasuti forwarded the disciplinary action to corporate. Nasuti avers that he had a right to appeal the disciplinary action to corporate rather than fill out an action plan. (Doc. 100, p. 15, Doc. 98, Nasuti declaration, ¶¶ 24, 33.) He does not point the Court to any language stating that he did not need to complete an action plan.

Nasuti elaborated at his deposition that he did not think he had to change any of his workplace behavior as a result of the orange disciplinary action. As Nasuti stated in the comment section on the disciplinary action, he was "informing [Heiting] that there were no changes because this orange violated corporate policy, so I kicked it up to corporate . . ." (Nasuti depo. 128:24-129:3). When asked whether he "didn't correct your behavior in any way because you didn't feel there was any need to do so," Nasuti responded, "No, I did not – There was nothing to correct. It was all forwarded to corporate to deal with Heiting." (*Id.* at 129:4-9).

On February 25, 2020, Ardie Wardell emailed Nasuti, asking him to meet with co-manager Josh Hehn the next day to discuss Nasuti's Open Door complaint.[1]  (Doc. 96-7.)  Wardell said he had been notified that some decisions had been made about Nasutt's complaint, and that Hehn would go over the findings with Nasuti.  (*Id.*)  Nasuti chose not to go to the meeting with Josh Hehn and instead called in to take a personal day for February 26 because he thought the email from Wardell "was just all a lie" and Nasuti "didn't know what was going on."  (Nasuti depo. 132.)

Nasuti asked for a leave of absence.  On February 27, 2020, Walmart's Market Human Resources Manager for South Dakota, Kacie Hall ("Hall"), sent Nasuti an email rejecting his request for a leave of absence because he had not been in his position for a long enough period to qualify for a leave of absence. (Doc. 96-8.)  At deposition, Nasuti testified that he did not think Hall's declining his leave of absence comported with company policy, stating, "Walmart corporate policy doesn't require enough time in the role.  Leave of absence can be approved for any time, so this is completely false." (Nasuti depo. 134:14-20).

Walmart's Leave of Absence policy (a copy of which Nasuti produced in his initial disclosures to Walmart) makes clear that there are three kinds of leave: Family Medical Leave Act ("FMLA"), personal leave, and leave for military service. (Ex. 96-24.)  Nasuti admits that he did not apply for FMLA leave.  Nasuti claims he should have been granted personal leave under Walmart policy which allows personal leave "for any compelling reason."

In Hall's February 27, 2020 email, she told Nasuti that he needed to report to work on Friday at his scheduled time or else he would be placed on suspension without pay.  (Doc. 96-8.)  Hall noted that Nasuti needed to go to work even though he had made complaints about the store: "I understand that you have raised concerns through our open door process and I am happy to report those concerns are currently being investigated by our Associate Relations team.  It is important to remember that even when we have these things happening in stores, our first responsibility is to our customers and our associates."  (*Id.*)

Nasuti responded to Hall's email by saying:

---

[1] In its response to Interrogatory number 10, Walmart disclosed that Hehn was going to let Nasuti know that his Ethics complaint had been received and investigated.  "He further was going to advise Plaintiff that his employment was going to be terminated."  (Doc. 108-4, p. 2.)

Kacie

Since I have already highlighted to Corporate the failures of HR in this District to protect employees at our store from Heiting's retaliation (which includes you as you surely knew about these women), your new retaliation is noted. It comports with the disappointing performance of Ardie.

Your direction for me to return to a clearly abusive environment will be forwarded. If a woman was being sexually harassed by her SM and two Co's, you would apparently order her back to work! You should be ashamed of yourself (but you are clearly are (sic) not). Hopefully everything will be dealt with by Corporate with the necessary housecleaning.

Matt

p.s. I am not scheduled to work on Friday

(Doc. 96-9.)

Hall responded to Nasuti's email, saying, "Thank you for the response. I am considering this email as your admitted failure to return to work and will be placing you on suspension today. If you would like the opportunity to meet with a team member at the store, you are invited to do so." (Doc. 96-9.) Nasuti did not meet with a team member to discuss his suspension. Instead, he forwarded Hall's email to what he called "her boss's boss's boss's boss," and considered the issue to be "on appeal" with Walmart's Home Office. (Nasuti depo. 138:15-22.)

On March 2, 2020, Nasuti was informed by email from Hall that he had been fired. The email did not list grounds or a basis for the termination. It stated:

Hello Matt,

After partnering with Home office, it has been decided that we will be separating employment with you today, March 2nd, 2020. You will have until EOB Tuesday, March 3rd to drop off your management keys and any other company property to the store."

Best of luck in your future endeavors,

Kacie

(Doc. 98-11.)

Documents produced by Walmart in discovery and attached to Nasuti's declaration indicate that he was terminated due to poor job performance. (Docs. 98-7 and 98-8.) Walmart admitted that "there were multiple, closely related reason why Walmart terminated Nasuti, all of which

implicated Nasuti's inability to do his job well or to obey his supervisors." (Doc. 108, p. 17, Walmart's response to Nasuti's undisputed fact #38.))

The termination decision was made by Wardell and Hall, after consultation with Heiting and associates at Walmart's Home Office. (Doc. 58-1 at ¶ 4; Doc. 58-2 at ¶ 4). Wardell and Hall explain in their declarations that, as the Market Manager and Market Human Resource Manager over the store in which Nasuti worked, each had authority to terminate his employment. (*Id.*) Nasuti disputes that Wardell and Hall possessed the authority to fire him, and he challenges whether he was ever really fired.

On March 2, 2020 - - the day Nasuti was terminated - - he emailed Yarnall after he received Hall's termination email, to say, "Kristi. Did you approve this? Perhaps maybe this is even more retaliation. Apparently your whole job, the imaginary 'no retaliation' policy and the entire Ethics process is just a sham. Luckily, it is all fixable in court. Shame on you for not protecting the women at my store. Former Secretary of State Madeline Albright said it best, There is a special place in Hell reserved for women who do not protect other women." (Doc. 96-12; Nasuti depo. 145:8-12). According to Nasuti, Yarnall did not communicate with him further after this email. (Nasuti depo. 145:16-20).

After terminating Nasuti, Walmart stopped paying him his salary and benefits. Nasuti never attempted to show up for work after March 2, 2020, notwithstanding his purported belief that he had not actually been terminated. (Nasuti depo. 140:24-141:1). No one has ever told Nasuti that he was fired as retaliation for his internal complaints. (*Id.* 171:17-20). Other than filing this lawsuit, Nasuti did not report his concerns to anyone outside of Walmart. (*Id.* 94:16-19). Nasuti has not filed a workers' compensation claim against Walmart. (*Id.* 16:13-18).

Nasuti represents himself in this lawsuit.[2] He asserts two claims against Walmart: (1) breach of an employment agreement; and (2) termination in violation of public policy in retaliation for his complaints. At the time he filed the lawsuit, Nasuti was a resident of South Dakota. He

---

[2] Nasuti graduated from the University of San Diego School of Law in 1980, and practiced law "[o]n and off for about 25 years" thereafter. (Nasuti depo. at 8:22-9:10).

filed the lawsuit in South Dakota state court, and Walmart removed the case to this Court based on diversity of citizenship under 28 U.S.C. § 1332.

On December 18, 2020, Nasuti filed a motion for summary judgment. (Doc. 56.) Nasuti argued that he was fired by a person who lacked the delegated authority to do so. Thus, according to Nasuti, his termination was an ultra vires act, his firing was void, he remains a Walmart employee, and he is entitled to wages and benefits. In response, Walmart submitted affidavits of Kacie Hall and Ardie Wardell attesting that they had the authority to terminate Nasuti's employment. (Docs. 58-1, 58-2.) This Court held that the existence of material facts as to whether Hall and Wardell had authority to terminate Nasuti's employment precluded summary judgment in Nasuti's favor. (Doc. 65.) On August 12, 2021, Nasuti renewed his motion for summary judgment and asks the Court to reconsider its decision denying his earlier motion. (Doc. 93.)

On August 16, 2021, Walmart moved for summary judgment. (Doc. 95.) With respect to the allegation of breach of employment contract, Walmart argues that Nasuti's employment with the company was at-will. Walmart contends that Nasuti's claim for termination in violation of public policy claim also fails because Nasuti' s internal complaints, which did not expressly raise sex or disability discrimination, are not protected conduct under South Dakota's narrow public policy exception to at-will employment. Walmart asserts that Nasuti lacked a good faith basis for believing that he was reporting unlawful conduct, and the he did not raise his concerns in good faith. Rather, he raised his complaints after receiving negative performance feedback for personal gain to change his evaluation. Finally, Walmart claims that Nasuti was not fired because of public-policy related complaints, but rather was terminated due to poor job performance and insubordination.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party can meet this burden by presenting evidence that there is no dispute of material fact or by showing that the nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

To avoid summary judgment, "[t]he nonmoving party may not rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (quotation omitted). Demonstrating only "some metaphysical doubt as to the material facts" is not sufficient. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *see also Crawford–El v. Britton,* 523 U.S. 574, 600 (1998) (in the face of a properly supported motion, requiring a nonmoving party to "identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of pro[of]"); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (if evidence supporting a claim "is merely colorable or is not significantly probative, summary judgment may be granted") (citing *First Nat'l Bank v. Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 290; *Dombrowski v. Eastland,* 387 U.S. 82 (1967) (per curiam)).  If a party bears the burden of proof at trial, summary judgment is appropriate against that party if it "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.,* 477 U.S. at 322.

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248 (citing 9A Charles Alan Wright et al., Federal Practice and Procedure § 2725, at 93–95 (3d ed. 1983)).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id*. at 247–48.

In ruling on a motion for summary judgment, the Court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987). All facts presented to the district court by the non-moving party are accepted as true if properly supported by the record. *See Beck v. Skon*, 253 F.3d 330, 332–33 (8th Cir. 2001). Moreover, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. The court must determine "whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

The same standard applies to cross motions for summary judgment. The Court views the record in the light most favorable to Walmart when considering Nasuti's motion, and the Court views the record in the light most favorable to Nasuti when considering Walmart's motion. *See Weber v. Travelers Home & Marine Ins. Co.*, 801 F.Supp.2d 819, 825 (D. Minn. 2011). Cross motions for summary judgment do not require a court to grant summary judgment in favor of one side or the other. *See Hot Stuff Foods, LLC v. Houston Cas. Co.*, 771 F.3d 1071, 1076 (8th Cir. 2014) (quoting *St. Paul Fire & Marine Ins. Co. v. Engelmann*, 639 N.W.2d 192, 199 (S.D. 2002)).

## DISCUSSION

I.   **Walmart's Motion for Summary Judgment**

   A.   **Breach of Contract**

Nasuti first claims that Walmart breached an employment contract with him. Under South Dakota law, the elements of a breach of contract action are: 1) an enforceable promise, 2) a breach of the promise, and 3) resulting damages. *Guthmiller v. Deloitte & Touche, LLP*, 699 N.W.2d 493, 498 (S.D. 2005).[3]

SDCL 60-4-4 provides: "An employment having no specified term may be terminated at the will of either party on notice to the other, unless otherwise provided by statute." Under South Dakota law, if an employer commits to follow a for-cause termination procedure by express or implied contract, an employee who has been terminated may have a cause of action if the employer fails to follow the specified termination procedure. *Holland v. FEM Elec. Ass'n., Inc.*, 637 N.W.2d 717, 721 (S.D. 2001). In this case, however, Nasuti has failed to come forward with any evidence that Walmart committed to a for-cause termination procedure, or in any way expressly or impliedly resigned its statutory right to fire employees at will. Nasuti does not deny that Walmart employment materials include explicit language regarding the at-will nature of employment and Walmart's right to terminate employment for any reason. (Doc. 98, p. 13-14.) Nasuti alleges,

---

[3] The parties do not dispute that Nasuti's claims arise under South Dakota law. Therefore, South Dakota substantive law applies to Nasuti's claims. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

however, that a "mix or combination" of the following things constituted a contract of employment between Nasuti and Walmart:

> The Wal-Mart Internet Ad (offer)
>
> Wal-Mart's On-Line policies to which the Ad referred Plaintiff
>
> Wal-Mart's internally accessed Personnel Manual or Equivalent
>
> The offer letter from Zachry Jones
>
> As supplemented and amended by what Plaintiff was promised at Wal-Mart Academy

(Doc. 98, Nasuti Declaration, p. 3.)  Nasuti claims that, at the Academy, Walmart made promises to him, including:

> (1) It has no tolerance for management abuses (2) It strictly adheres to its policies and rules (3) Stores are to be operated in a safe manner (4) All employees are treated fairly (5) All employees are treated equally (6) All employees are respected (7) Annual evaluations are honestly given (8) Discipline is fair and honest (9) The Company obeys all laws and does not discriminate. (10) Any problems can be remedied and appealed to the Ethics Office or to any senior manager under the Open Door policies and will be fully addressed by that person/office. (11) No one can be retaliated against for whistleblowing (12) No one will be fired at least until any Corporate investigation is completed. (13) Investigations will be competently conducted.

(Doc. 98, Nasuti declaration, p. 4.)

None of these alleged promises, nor any of the alleged documents that Nasuti claims created a contract, are enough for the Court to find "a clear intention on the employer's part to surrender its statutory power to terminate its employees at will," which the South Dakota Supreme Court has stated is a necessary component of an implied surrender of at-will rights. *Butterfield v. Citibank of South Dakota, N.A.,* 437 N.W.2d 857, 859 (S.D. 1989).  Nasuti's employment letter includes explicit language that his employment was at-will and could be terminated "at any time for any or no reason, consistent with applicable law." (Doc. 96-15, p. 3.)  Nasuti signed the letter. (*Id.*)  In addition, Walmart employment policies, including two which Nasuti filed in the record, state that employment with Walmart is on an at-will basis.  The evidence in the record shows that Walmart explicitly reserved its at-will termination power as provided in SDCL 60-4-4.

Nasuti argues that Walmart has a personnel manual or an equivalent which Nasuti believes would result in a contract of employment between him and Walmart.  Earlier, Nasuti asked the

Court to sanction Walmart for failing to produce a copy of the Walmart personnel manual.  This Court held:

> In response to Nasuti's request for a copy of the Walmart personnel manual, Walmart responded that it does not have a personnel manual as that term is commonly understood. Nasuti alleges this is a false statement. He asserts that the Employee Manual is downloaded on an internal server, accessible in each store. Nasuti attaches a copy of what he says is the cover page of an employee handbook as Exhibit 17 to his Omnibus Motion.
>
> In response, Walmart submitted a declaration of Kacie Hall, who was the Human Resources Manager for Walmart's Spearfish store. (Doc. 82-3.) She said that Walmart used what they termed "associate handbooks" until approximately the late 1990s. Such handbooks have not been issued since Hall started working for Walmart in 2005.  Hall avers that Nasuti's Exhibit 17 is not a Walmart policy or document of any kind.  Again, the Court cannot sanction Walmart for failing to produce something that does not exist.

(Doc. 90, p. 8.)

Nasuti has not shown that there is a question of fact regarding the existence of an express or implied contract between him and Walmart, either in a personnel manual or anywhere else, and his breach of contract claim cannot survive summary judgment.  Accordingly, Walmart's motion for summary judgment on Nasuti's breach of contract claim is granted.

### B.    Wrongful Termination

Nasuti's second claim is that Walmart terminated his employment in retaliation for expressing his concerns in his complaints to the corporate office.  South Dakota is an employment-at-will state. *Aberle v. Aberdeen*, 718 N.W.2d 615, 621 (S.D. 2006) (citing SDCL § 60-4-4). Therefore, "an employment having no specified term may be terminated at the will of either party." *Id.* at 621 n.2. However, there are certain public policy exceptions to this rule. The South Dakota Supreme Court has recognized a cause of action for employees under public policy exceptions for: (1) termination for "refusal to commit a criminal or unlawful act"; (2) termination in retaliation for "filing a worker's compensation claim"; and (3) termination in retaliation for whistleblowing that serves a public purpose. *Dahl v. Combined Ins. Co.,* 621 N.W.2d 163, 166–67 (S.D. 2001). Exceptions to the employment at-will doctrine are narrowly construed under South Dakota law. *See Petersen v. Sioux Valley Hosp. Ass'n.*, 486 N.W.2d 516, 520 (S.D. 1992)  In order to prevail in such a case, the plaintiff must establish that the "employer's motivation for termination

contravenes a clear mandate of public policy." *Niesent v. Homestake Min. Co.,* 505 N.W.2d 781, 783 (S.D.1993).

South Dakota applies the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), to actions for wrongful termination. *See Lord v. Hy–Vee Food Stores,* 720 N.W.2d 443, 449–50 (S.D. 2006). The employee must first establish a prima facie case for retaliation. To establish a prima facie case of retaliatory discharge, the complainant has to show that he "(1) engaged in a statutorily protected activity, (2) the employer took adverse action against [him], and (3) there is a causal connection between the protected activity and adverse action." *Williams v. S.D. Dep't of Agric.,* 779 N.W.2d 397, 402 (S.D. 2010) (citing *Coleman–Santucci v. Sec., U.S. Dep't of Health & Human Servs.,* 754 F.Supp. 209, 216 (D.D.C.1991)).

If a prima facie case of retaliation is established, "the burden shifts to the employer to produce some legitimate, non-discriminatory reason for the adverse action." *Leslie v. Hy-Vee Foods, Inc.,* 679 N.W.2d 785, 789 (S.D. 2004) (citing *Palesch v. Missouri Comm'n on Human Rights,* 233 F.3d 560, 569 (8th Cir. 2000)). If the employer meets this burden, the employee must prove the proffered reason is a pretext for retaliation. *Id.*

The ultimate question in a retaliation case is whether the employer's adverse action against the employee was motivated by retaliatory intent. *Lord*, 720 N.W.2d at 453. The shifting burdens do not change the ultimate burden of proof, which is always on the plaintiff. *See Wallace v. DTG Operations, Inc.,* 442 F.3d 1112, 1119 (8th Cir. 2006) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)).

### 1.   Prima Facie Case

As set forth above, there are three elements to a prima facie retaliation case. Nasuti must demonstrate that he took part in protected conduct, that he was subjected to an adverse employment action, and that there exists a causal nexus between the protected conduct and the adverse action. "The plaintiff's burden at the prima facie case stage of the analysis is not onerous, and '[a] minimal evidentiary showing will satisfy this burden of production.' " *Wallace*, 442 F.3d at 1119 (citing *Rodgers v. U.S. Bank*, 417 F.3d 845, 850 (8th Cir. 2005)).

Title VII prohibits retaliation by employers against employees who engage in protected conduct, which includes "either opposing an act of discrimination made unlawful by Title VII ('the

opposition clause'), or participating in an investigation under Title VII ('the participation clause')." *Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021, 1028 (8th Cir. 2002). The opposition clause protects an employee against discrimination for opposing an unlawful employment practice. The Supreme Court has interpreted this provision broadly, and the threshold for oppositional conduct is not high. *Crawford v. Metro Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 276 (2009). Instead, "[w]hen an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's *opposition* to the activity." *Id.* at 276 (internal quotation marks omitted) (citing 2 EEOC Compliance Manual §§ 8–II–B(1), (2), p. 614:0003 (Mar. 2003)).

The Eighth Circuit also has interpreted the opposition clause broadly, finding that protected activity includes more than filing a formal charge of harassment. Internal complaints or informal complaints to superiors are also protected activity under Title VII, *Gagnon v. Sprint Corp.*, 284 F.3d 839, 854 n.4 (8th Cir. 2002), *abrogated on other grounds by Desert Palace v. Costa*, 539 U.S. 90 (2003), as is "expressing a belief that the employer has engaged in discriminatory practices." *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 714 (8th Cir. 2000) (reporting supervisor's comment that "women and minorities don't belong in [this] business" was protected act). Although Title VII protects an employee contesting what he or she reasonably believes to be an unlawful employment practice, it does not "insulate an employee from discipline for violating the employer's rules or disrupting the workplace." *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999).

Walmart argues that "no reasonable person would interpret Nasuti's internal complaints as opposing sex or disability discrimination." (Doc. 96, p. 34.) That argument is belied by the Report of Investigation prepared by Kristi Yarnall. (Doc. 96-32.) Yarnall described one of the issues raised by Nasuti as gender discrimination, explaining that Heiting refused to move female employee Larsen to a smaller area, but moved her male peer to a smaller area. (*Id.* at p. 2.) In her findings, Yarnall reported that "Heiting denied treating males more favorable than females." (*Id.*) Furthermore, Nasuti attached to his declaration a document that he described as one of his "Corporate Complaints," showing he reported a conversation with a long-term female Assistant Manager who said "that one has to have a penis in this store in order to succeed." (Doc. 98-3, p. 1.) The same document indicates that Nasuti reported that Heiting exhibited hostility toward

McMannis, and Nasuti stated that "[t]his is Heiting's pattern, which he applied even more abusively against the two female DMs I wrote to your [sic] about." (Doc. 98-3, p. 2.) In addition, on one page of his deposition where he was being questioned about Heiting's treatment of McMannis, Nasuti said it "appeared to be all gender related." But because the previous page of Nasuti's deposition where the question appeared was not filed by Walmart, the Court does not know the question to which Nasuti was responding. Viewing the record in the light most favorable to Nasuti, the Court concludes that a reasonable person could interpret Nasuti's complaints as opposing sex discrimination.

Walmart also argues that Yarnall's report does not support Nasuti's claim that he raised a good faith concern of gender discrimination in his Ethics complaint because, when read in conjunction with Nasuti's deposition testimony, his Ethics complaint cannot be interpreted as raising a concern of gender discrimination for Jean Larsen. (Doc. 116.) Walmart points out that Nasuti admitted at deposition that he was "not sure" of the reason Corey Heiting declined to transfer Larsen to a different role. (Doc. 96-1, Nasuti depo. at 33:20-34:1) (Nasuti testifying, "[Heiting] didn't want to talk about [Larsen]. He would talk about male department supervisors and moving them. He wouldn't – so he – he – In my view, he was talking strictly about her gender or that he had a personality issue with her. I'm not sure, one or the other."). But Nasuti also testified that several of his female coworkers suffered unfair treatment because Heiting "treated women different than men." Nasuti also described female assistant managers quitting "in part because they weren't being treated properly." He said that no male assistant manager quit. Rather "[i]t was only females. So you can do the statistics. There was a problem there." Walmart cites no authority for the proposition that a whistleblower's concerns must be objectively reasonable. In summary, there is evidence in the record that Nasuti's concerns about Heiting's treatment of female employees were raised in good faith.

Walmart also contends that Nasuti's concerns about the female employees at the Store were not raised in good faith because he didn't report them to Walmart until *after* he received his negative performance evaluation, and he only reported the concerns at that time because he wanted to get the results of his performance evaluation changed. As stated earlier, at the prima facie stage of the analysis Nasuti need only make "a minimal evidentiary showing" to satisfy his burden of production. A reasonable fact-finder could find that Nasuti honestly believed he was reporting

unlawful conduct, even though Nasuti also was dissatisfied with his performance evaluation. Viewing the record in the light most favorable to Nasuti, one could conclude that Nasuti believed Heiting's treatment of women was discriminatory in violation of the law, and that he reported it in good faith.   The Court concludes that sufficient evidence exists on which a reasonable person could believe Nasuti engaged in protected activity.   Thus, Nasuti has met the first element of a prima facie case.

Regarding the second prong of a prima facie case, Nasuti's termination shows an adverse employment action.[4]

The third element of a prima facie case, a causal link, is "a showing that an employer's 'retaliatory motive played a part in the adverse employment action[.]' " *Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 896–97 (8th Cir. 2002) (quoting *Sumner v. United States Postal Service*, 899 F.2d 203, 208–09 (2d Cir. 1990)).   Evidence establishing an inference of a retaliatory motive is sufficient to establish a causal link.  *Id.* at 897.  "[C]ourts have not required a claimant to prove that the protected activity was the sole cause of the adverse employment action.   Instead, they require a plaintiff to show that the . . . complaint was 'merely a contributing factor' in the decision to terminate his employment."  *Lord*, 720 N.W.2d at 450 (citing *Wiehoff v. GTE Directories Corp.*, 61 F.3d 588, 598 (8th Cir. 1995)).

A causal connection may be inferred from the closeness in time between Nasuti's complaint of gender discrimination on February 18, 2020 and his termination on March 2, 2020. *See, e.g.*, *Rath v. Selection Research, Inc.*, 978 F.2d 1087, 1090 (8th Cir. 1992) (holding that the requisite causal connection may be proved circumstantially by showing the discharge followed the protected actively so closely in time as to justify an inference of retaliatory motive).   However, more than a temporal connection between protected activity and an adverse employment action is required to show a genuine factual issue on retaliation exists.  *See, e.g.*, *Nelson v. J.C. Penney Co., Inc.*, 75 F.3d 343, 346–47 (8th Cir. 1996) (plaintiff fired a month after he filed age discrimination charge failed to establish causal link without evidence in addition to temporal proximity). Knowledge by the decisionmaker of the protected activity is one such fact, for if the decisionmaker

---

[4] Though Nasuti claims in his motion for summary judgment that his termination was an ultra vires act and thus he is still employed at Walmart, that argument fails.  Walmart terminated Nasuti's employment and he is no longer an employee of Walmart.  See the discussion regarding Nasuti's motion for summary judgment on pages 31-33 of this Opinion.

was unaware of the protected activity, no reasonable factfinder could decide the plaintiff's discharge occurred, as the statute requires, "because" of engagement in the protected activity. *See Buettner,* 216 F.3d at 715 ("A plaintiff must show the employer had actual or constructive knowledge of the protected activity in order to establish a *prima facie* case of retaliation.").

At the hearing on the motions for summary judgment, Walmart argued that Nasuti did not communicate any discrimination concerns to the two people who fired him, Kacie Hall and Ardie Wardell. However, Hall's February 27, 2020 email to Nasuti suspending him for refusing to return to work states, in part, "I understand that you have raised concerns through our open door process and I am happy to report those concerns are currently being investigated by our Associate Relations team." (Doc. 96-8.) This is evidence that Hall, one of the decisionmakers with respect to Nasuti's termination, had knowledge of Nasuti's complaints, some of which were labeled as gender discrimination by Yarnall in her investigative report. In addition, Wardell sent an email to Nasuti on February 25, 2020, indicating he had been notified of some decisions that had been made in regard to Nasuti's complaint. (Doc. 96-7.) Viewed favorably to Nasuti, there is evidence in the record indicating that the people who fired him were aware of his complaints of discrimination. *Compare Cole v. May Dep't Stores Co.,* 109 Fed.Appx. 839, 841 (8th Cir. 2004) (no connection between adverse employment action and protected activity where there was no evidence that any person aware of a pending discrimination charge was involved in the decision-making).

In summary, viewing the evidence in the light most favorable to Nasuti and resolving all conflicts in the evidence in his favor, the record shows the following:

1.  On February 18, 2020, Nasuti filed his Ethics/Open Door Complaint with Walmart's Executive Vice-President for HR, Julie Murphy, and its Senior Vice-President for Ethics Investigations, Lance Lanciault.

2.  On February 24, 2020, Heiting issued Nasuti an "orange" disciplinary citation.

3.  On February 24, 2020, Nasuti emailed district manager Ardie Wardell and apprised him of the disciplinary citation, which Nasuti said was retaliatory.

4.  On February 25, 2020, Wardell emailed Nasuti, saying Wardell had been notified of decision regarding Nasuti's complaint.

5. On February 27, 2020, Hall's email to Nasuti stated she was aware of the concerns he raised through Walmart's open door policy.

6. On February 27, 2020, Hall suspended Nasuti without pay.

7. On March 2, 2020, Nasuti's employment was terminated by Hall and Wardell.

8. In her subsequent Report of Investigation, Yarnall labeled some of Nasuti's ethics complaints as gender discrimination.

Given the temporal proximity and the increasing levels of discipline that followed close on the heels of Nasuti's Ethics/Open Door Complaint, the Court concludes that Nasuti has proffered "a minimal evidentiary showing" of a causal link sufficient to satisfy his burden of production on this final prong of his prima facie case.

## 2. Legitimate, Non-Retaliatory Reason for Termination

Because Nasuti established a prima facie case of retaliation, the burden shifts to Walmart to articulate some legitimate, non-retaliatory reason for the adverse employment action. *McDonnell Douglas,* 411 U.S. at 802. The employer's burden "is to rebut the presumption of discrimination by producing evidence that the plaintiff [suffered an adverse employment action] for a legitimate, nondiscriminatory reason." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *see McDonnell Douglas*, 411 U.S. at 802–03. Walmart's burden at this stage is only a burden of production, not persuasion. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000) ("This burden is one of production, not persuasion . . . ."); *St. Mary's Honor Center*, 509 U.S. at 509 (regardless of its persuasive value, production of evidence establishing nondiscriminatory reasons for the employment action satisfies the burden of production).

Because of the low threshold applicable at this stage, it is unnecessary for an employer to prove "that it was actually motivated by the proffered reasons." *Burdine,* 450 U.S. at 254. In other words, an employer need not persuade the court that "it had convincing, objective reasons for the actions taken. *See id.* at 257 (reversing Fifth Circuit for employing such a standard). Instead, "[i]t is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff," *id.* at 254–55, by " 'set[ting] forth, through the introduction of admissible evidence,' reasons for its actions which, if believed by the trier of fact, would support

a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr.*, 509 U.S. at 507 (quoting *Burdine,* 450 U.S. at 254–55) (emphasis deleted).

If the defendant produces a legitimate, nonretaliatory reason, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason is merely a pretext for retaliation. *Burdine*, 450 U.S. at 253; *see also Leslie*, 679 N.W.2d at 789; *Johnson v. Kreiser's, Inc.*, 433 N.W.2d 225, 227–28 (S.D. 1998).

The record shows the following examples of Walmart's evidence of legitimate, non-discriminatory reasons for Nasuti's termination.

On January 10, 2020, Heiting had a conversation with Nasuti (which co-manager Josh Hehn witnessed) following which Heiting recorded in writing his impressions. (Docs. 96-25 and 96-26.) Heiting's notes state that he discussed Nasuti's "needed attendance at management tours and meetings, helping answer management calls, and [Heiting] challenged him on building relationships with the team to assist." (Doc. 96-26, p. 2.) Heiting recorded that Nasuti was "[e]xtremely defensive and upset," by this, and responded by "challenging every bit of feedback that he receives." (*Id.*) Among other things, Heiting requested that Nasuti: "1. Be more receptive and willing to take feedback, 2. Development comes in several facets and sometimes we just need to write the stuff down and not challenge everything, 3. Take the approach with feedback as 'an invitation to be part of the team' as opposed to a victim being punished to have to be at meetings and various tasks . . ." (*Id.*) Heiting stated that Nasuti "was still noticeably dissatisfied" after their meeting "but clearly understood the asks and [that] the opportunity is in his hands." (*Id.*) At deposition, Nasuti did not deny that this meeting took place, but he did not recall the things listed by Heiting, stating that it was a year and a half ago. (Nasuti depo. 120-122.) Nasuti said that Heiting "might have said take feedback" during the meeting, but that "if the feedback was violation of company policy then I wasn't going to take it." (*Id.* at 121:12-14.) Nasuti testified that after this meeting, he did not correct his behavior in any way because "there was nothing to change." (*Id.* at 129:10-16.)

On February 1, 2020, Heiting and co-manager Manny Schryvers had another conversation with Nasuti, for which Heiting also took notes. The notes reflect:

> Co Mgr Manny and myself had conversation with Matt about his tours, building relationships, and his desire/drive to be an ASM for us. Mentioned that perception is that

he does not want to be here.  He is touring just to check the box, not even with his DMs present.  Expectations of his tours and our direction moving forward were set.  Discussion lasted nearly an hour.

(Doc. 96-26, p. 1.)  At deposition, Nasuti testified that he remembered this meeting, and recalled Heiting saying "we don't think that you're happy," which Nasuti thought was "just really creepy" and "a weird thing to say." (Nasuti depo. 122:24-123:1.)

On February 3, 2020, Nasuti emailed Heiting to complain about fellow male assistant manager Ferguson, including that Ferguson was not a good manager for the overnight shift.  (Doc. 96-3.)  Heiting subsequently discussed this email with Nasuti and informed him that it was not appropriate for him to say the Ferguson was a poor fit for the overnight shift. (Nasuti depo. at 104:9-14.)  Nasuti then sent a text message to co-manager Manny Schryvers.  (Doc. 96-4.)  The entire text message is set forth on page five of this Opinion.  Nasuti accused Schryvers of not defending him, accused Heiting of attacking Nasuti for giving Heiting bad news, complained about Heiting's management, and reiterated that Ferguson should be moved to a different position.

Nasuti did not think he needed to change his behavior following the meetings with Heiting on February 1 and 3, because "those discussions were all pretext" and Nasuti was going to "continue to comply with corporate policy."  (Nasuti depo. 129:23-25.)

Then, on February 5, 2020, Nasuti sent the lengthy email to Heiting which is set forth on pages 5-7 of this Opinion.  There still was no complaint about gender discrimination from Nasuti at this point, and Nasuti had not received his poor performance evaluation. Consistent with his statement in the email to Heiting that he would "call in" until February 25, Nasuti did not work for about seven to ten days after he sent the email.  (Nasuti depo. 114:5-8.)  Nasuti does not contend that anyone at Walmart approved of his refusal to work.

On February 14, 2020, Nasuti received the "below expectations" performance evaluation. (Docs. 96-25 at ¶ 4; 96-27; Nasuti depo. 147:4-7.)  Heiting commented in the evaluation that Nasuti was "[r]elatively new to role with several areas of development needed in all three facets: Merchandise, Operations, and People. Building relationships, internal networking, as well as self-motivated training are key topics for people development. In addition, feedback acceptance needs to improve. Has basic merchandising understanding; opportunity to improve SWAS planning and leading the teams 30, 60, 90 day strategy on features, modular, and seasonality. Operational

opportunities with touring execution, daily 100% execution follow up of CAP and topstock processes, global store tasks understanding and knowledge." (Doc. 96-27.)

On February 18, 2020, Wardell responded to an email from Nasuti requesting approval for paid time off ("PTO"). (Doc. 58-1, ¶ 3.) Wardell said that he could not approve PTO for Nasuti because of the amount of time he had previously taken off, and that Nasuti would need to apply for a leave of absence instead. (*Id.*)

Also on February 18, 2020, Nasuti submitted his Ethics/Open Door Complaint.

On February 26, 2020, Heiting issued the orange disciplinary action based on poor job performance. Nasuti admitted that he did not change his conduct after the disciplinary action.

On February 27, 2020, Hall emailed Nasuti denying his request for a leave of absence because he had not been in his position long enough to qualify. Hall mentioned that the amount of time Nasuti had missed work had become a concern and that he needed to report to work or else he would be suspended without pay. Nasuti responded that Hall was retaliating against him, that she should be ashamed of herself, and that everything would "be dealt with by Corporate." (Doc. 96-9.) Hall interpreted Nasuti's response to be an admitted failure to return to work and placed him on suspension. (Doc. 96-16, ¶11.)

Hall and Wardell decided to terminate Nasuti's employment, and that occurred on March 2, 2020. According to Hall and Wardell,

> Nasuti had refused to respond to feedback, was insubordinate to me and other management and we believed he had failed to perform his job duties including as directed. He failed to respond to feedback issued to him verbally, in his evaluation and in his Code Orange Discipline. He further failed to prepare a Plan of Action in response to the Code Orange.

(Doc. 96-16, Declaration of Kacie Hall at ¶ 12; Doc. 96-34, Declaration of Ardie Wardell at ¶ 5.)

Walmart has offered numerous legitimate, nonretaliatory explanations for terminating Nasuti's employment. The reason preferred by Walmart for firing Nasuti are supported by affidavits and other documentation, including Nasuti's own deposition testimony. Walmart's proffered evidence is sufficient to set forth legitimate and non-retaliatory reasons for termination

27

of Nasuti's employment.  Because Walmart has rebutted Nasuti's prima facie showing, the burden of proof shifts back to Nasuti.

### 3.    Pretext

Because Walmart has produced legitimate, nonretaliatory reasons for Nasuti's termination, Nasuti must produce sufficient evidence supporting his contention that the non-retaliatory reasons proffered by Walmart are pretextual for retaliation.  The Court finds that he has not.

Courts have identified several methods of proving that an employer's proffered justification is pretext:

> An employee may prove pretext by demonstrating that the employer's proffered reason has no basis in fact, that the employee received a favorable review shortly before he was terminated, that similarly situated employees who did not engage in the protected activity were treated more leniently, that the employer changed its explanation for why it fired the employee, or that the employer deviated from its policies.

*Phillips v. Mathews,* 547 F.3d 905, 913 (8th Cir. 2008) (quoting *Stallings v. Hussmann Corp.,* 447 F.3d 1041, 1052 (8th Cir. 2006)).  Nasuti has not introduced any evidence showing a positive performance review prior to termination, nor has he shown that similarly situated employees were treated differently.

Nasuti argues that pretext is evidenced by the "shifting" reasons for his firing.  He relies in part on two documents provided to him by Walmart in discovery which he attached to his declaration as Exhibits 7 and 8.  Exhibit 7 states that he was terminated for "inability to perform job." (Doc. 98-7.)  Exhibit 8 states:

> Corey Heiting:  Matt is being terminated due to Unsatisfactory Job Performance. He has not performed at expected levels of his role and was recently issued a disciplinary action on 2/24/20.  In response to that DA, Matt has not returned to work.  He did request for a personal LOA per reason "Other" which was denied.  Still has not reported absence to the store not returned to work.   This is an example of Matt's desire to be "un-manageable" which is a reason for termination.  Other reasons for termination are his lack of willingness to accept feedback and show improvement, including his failure to Action Plan his DA and acknowledge his recent evaluation.  This termination has been authorized through MHRM Kacie Hall MM Ardie Wardell, and Home-office legal counsel.

> Corey Heiting.  Witnesses Co-Mgrs Manny Schryvers and Josh Hehn.  The termination was authorized by MHRM Kacie Hall, and notification sent to Matt via email prior to termination conducted.

(Doc. 98-8.)

The Court concludes that Nasuti's Exhibits 7 and 8 are additional evidence in support of Walmart's decision to terminate his employment, and that the exhibits do not support Nasuti's argument that the reasons for his termination were pretextual.

The same reasoning applies to page 1 of Nasuti's Exhibit 11. (Doc. 98-11, p. 1)  That page contains a February 25, 2020 email from Heiting to himself.  It states:

> On 2/25/20 at 8:15 am MHRM Kacie Hall called my cell phone.  During this call, she informed me that we would be separating Matt Nasuti's employment due to the following reasons:  1. Unprofessionalism, 2. Inability to Manage moving forward, 3. Unreceptiveness to feedback and willingness to improve.
>
> Several of these items are ongoing and most recently stemmed from a disciplinary action that took placed on 2/24/20 around 4:00 between myself and the two Co-Mgrs as witness.  The DA was around Job performance, and Matt's approach to this DA feedback was unreceptive, and claiming retaliation from other issues that had nothing to do with the performance topics.  He displayed zero willingness to accept the feedback and action plan improvement moving forward.

(Doc. 98-11, p. 1.)  The last paragraph of Hieting's February 25 email was redacted by Walmart as confidential.  Walmart's Privilege Log explains that it redacted "legal advice received from Walmart Legal regarding Plaintiff's employment. (Doc. 82-1, p. 4, No. 16.)  Nasuti contends that the redacted facts "are potential smoking guns that provide answers that Wal-Mart does not want revealed."  (Doc. 97, p. 21.)  Nasuti's speculation about the redacted paragraph does not outweigh the clear evidence in the first two paragraphs that supports Walmart's decision to terminate his employment.

Nasuti points to an email string that Walmart produced to him in discovery, arguing that it could demonstrate pretext.  He attaches it as part of Exhibit 11 to his declaration. (Doc. 98-11, pp. 2-4.).  This exhibit shows that, after Nasuti sent the email to Kristi Yarnall on March 2, 2020, asking if she had approved his termination, Yarnall forwarded Nasuti's email to Monica Straube, stating, "See below.  Apparently the business didn't wait for the Ethics ticket to be over?  Do you have any info regarding his termination?" (Doc. 98-11, p 3.)  Straube responded:

> I just checked my system and I don't see another case in our Ethics System that involves ASM Matt.  I have no idea why they terminated Matt or for what reason.  You may need to get clarification from the MHRM.  That might help explain why Matt was a no show for your scheduled interview.  Maybe the MHRM partnered with Insider Trust or

some other Home Office department.  I'll be out of the office this afternoon, however, please give me a call in the morning if anything comes up. Thank you.

(Doc. 98-11, p. 2.)  Yarnall then emailed Straube indicating that she just got off the phone with MHRM.  The remainder of the email from Yarnall was redacted by Walmart.  In its Privilege Log, Walmart explains that the redaction was confidential because it was about seeking legal advice in preparation for defense of an anticipated lawsuit.  (Doc. 82-1, P. 3, No. 8.)  Straube emailed Yarnall back saying, "That sounds good!  Thank you for the update." (*Id.*)

Nasuti asserts that the emails between Yarnall and Straube support his contention that Wardell and Hall did not have authority to fire him because his Ethics Complaint was pending and therefore only "someone senior at Corporate" could have approved his termination.  (Doc. 97, p. 21.)  However, the emails between Yarnall and Straube in the Ethics department of Walmart show that the two women did not know why Nasuti was fired, and that they sought clarification from the MHRM.  (Other documents identify the MHRM as Kacie Hall.)  Though a portion of the email between Yarnall and Hall was redacted for confidentiality reasons, Nasuti was welcome to depose Straube, Yarnall, Hall, or anyone else involved in his termination or in the investigation of his complaints, in order to meet his burden of showing that Walmart's proffered reasons were not the true reasons for his termination.  Nasuti's speculation that Walmart is hiding something about his termination is not enough to demonstrate that Walmart's legitimate, nonretaliatory reasons for firing Nasuti are pretext.

Walmart had problems with Nasuti's work even before his February 14, 2020 poor performance evaluation (which was issued before Nasuti's February 18, 2020 Ethics Complaint.) Nasuti had been working at Walmart's Spearfish store for only about four months when Heiting began talking to him about improvements he needed to make.  Heiting's documentation made after the conversation with Nasuti on January 10, 2020 states that Nasuti challenged "every bit of feedback that he receives." (Doc. 96-26.)

Nasuti often states that he could not afford to undertake any additional discovery, but Nasuti has not shown that anyone prevented him from obtaining discovery from any person who played a role in his termination or in the investigation of his complaints. Nasuti admitted that he received over one thousand pages of discovery information from Walmart.

As stated by the Eighth Circuit, "[f]or a plaintiff to survive summary judgment, [he] must adduce enough admissible evidence to raise genuine doubt as to the legitimacy of a defendant's motive, even if that evidence does not directly contradict or disprove a defendant's articulated reasons for its actions." *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 717 (8th Cir. 2000) (citing *Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 945 n. 8 (8th Cir. 1994)). Though close in time, Walmart's reasons for firing Nasuti are well-documented and are independent from the complaints Nasuti filed, and they are legitimate, nonretaliatory reasons. Nasuti has not presented evidence showing that Walmart's articulated reasons for his termination are false, nor has he offered evidence sufficient for a reasonable trier of fact to infer that retaliation was a reason for his termination.[5] Accordingly, summary judgment is granted in favor of Walmart on Nasuti's wrongful termination claim.

## II.     Nasuti's Renewed Motion for Summary Judgment/Motion for Reconsideration

On December 18, 2020, Nasuti filed his initial motion for summary judgment. (Doc. 56.) Nasuti argued that he was entitled to judgment in his favor because Kacie Hall and Ardie Wardell did not have authority to terminate his employment and, therefore, his termination is void and he remains a Walmart employee. In opposition to Nasuti's motion for summary judgment, Walmart submitted declarations of Kacie Hall and Ardie Wardell attesting that they had the authority to terminate Nasuti's employment. (Docs. 58-1, 58-2.) This Court held that the existence of material facts as to whether Hall and Wardell had authority to terminate Nasuti's employment precluded summary judgment in Nasuti's favor. (Doc. 65.) The Court declined to address Walmart's argument that Nasuti's ultra vires theory fails as a matter of law under South Dakota's employment at-will doctrine because it was clear on the record that Nasuti's motion for summary judgment must be denied. (Doc. 65, p. 6 n. 2.)

---

[5] In his opposition to Walmart's motion for summary judgment, Nasuti argues that Walmart should have been ordered to produce his entire personnel file by this Court when the Court ruled on motions in its Opinion issued on August 4, 2021. (Doc. 97, p. 25.) There, the Court interpreted Nasuti's request as one for items in his personnel file that were complimentary to him. (Doc. 90, p. 8.) Nasuti argued that, because he was an "external" hire, Walmart must have obtained "glowing reports" about him. (Doc. 78, p. 20.) Walmart's lawyer asserted that it had not concealed Nasuti's personnel file and, in fact, had "produced dozens of documents responsive to Nasuti's request for his personnel information." (Doc. 82, p. 9.) This Court ruled that "[t]here is no showing that Walmart is concealing complimentary documents from Nasuti's personnel file, and it is not clear how such documents are related to the termination of Nasuti's employment." (Doc. 90, p. 8.)

Nasuti contends that this renewed motion is necessary because he did not receive Hall and Wardell's job descriptions until after briefing on his original motion for summary judgment. Nasuti argues that the job descriptions show Hall and Wardell did not have authority to fire him because the job descriptions do not expressly state that their jobs include firing authority. Nasuti also asserts that this Court erred when it considered the declarations of Hall and Wardell as evidence when it denied his original motion for summary judgment. According to Nasuti, the declarations of Hall and Wardell are false declarations - - "felonies, which the Court should have referred to the U.S. Attorney and the District's Ethics Panel, but instead has condoned." (Doc. 93, p. 5.)

### A.   Standard of Review

"Any motion that draws into question the correctness of the judgment is functionally a motion under [Fed.R.Civ.P. 59(e)], whatever its label." *Quartana v. Utterback*, 789 F.2d 1297, 1300 (8th Cir.1986) (quoting 9 J. Moore, Moore's Federal Practice ¶ 204.12[1] at 4–82 (2d ed. 1995)). Rule 59(e) empowers district courts to alter or amend judgments. Fed.R.Civ.P. 59(e). The Rule was adopted " 'to mak[e] clear that the district court possesses the power to rectify its own mistakes in the period immediately following the entry of judgment.' " *Norman v. Ark. Dep't of Educ.*, 79 F.3d 748, 750 (8th Cir. 1996) (quoting *White v. N.H. Dep't of Emp. Sec.*, 455 U.S. 445, 450 (1982)). Motions under Rule 59(e) "serve the limited function of correcting 'manifest errors of law or fact or to present newly discovered evidence.' " *United States v. Metro. St. Louis Sewer Dist.*, 440 F.3d 930, 933 (8th Cir. 2006) (quoting *Hagerman v. Yukon Energy Corp.*, 839 F.2d 407, 414 (8th Cir. 1988)). They cannot " 'be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment.' " *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) (quoting 11 Charles Alan Wright et al., Federal Practice & Procedure § 2810.1, at 127–28 (2d ed. 1995) (footnotes omitted)). District courts have " 'broad discretion' " in deciding whether to grant or deny such a motion, and the Eighth Circuit will not reverse " 'absent a clear abuse of discretion.' " *Sparkman Learning Ctr. v. Ark. Dep't of Human Servs.*, 775 F.3d 993, 1001 (8th Cir. 2014) (quoting *Christensen v. Qwest Pension Plan*, 462 F.3d 913, 920 (8th Cir. 2006)).

### B.   Discussion

Nasuti cites no legal authority for the proposition that a job description must expressly state that an employee has authority to fire, and the Court is aware of none. In a different context, the

Supreme Court has noted that "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform." *Garcetti v. Ceballos*, 547 U.S. 410, 424–25 (2006). There is nothing in Hall or Wardell's job descriptions that preclude them from terminating employees. In addition, Walmart has pointed to language in the job descriptions that support Hall and Wardell having authority to terminate Nasuti. Simply put, Hall and Wardell's job descriptions do not call into question the correctness of this Court's previous order denying Nasuti's motion for summary judgment.

Furthermore, Nasuti has failed to controvert Hall and Wardell's declarations which demonstrate that they had authority to terminate his employment. In order to satisfy the requirement of Rule 56(c)(4), a declaration used to oppose a motion for summary judgment must be based on personal knowledge, set forth facts that would be admissible in evidence, and show the declarant is competent to testify to the matters stated therein. Fed.R.Civ.P. 56(c)(4). Hall and Wardell's declarations satisfy all of these requirements.

The Court has no reason to believe that Hall and Wardell falsely swore under penalty of perjury that they had authority to terminate Nasuti's employment.

Finally, the Court rejects Nasuti's claim that he is still an employee of Walmart. On March 2, 2020, Nasuti was fired by Hall and Wardell. He did not return to work after his termination, he was not paid after his termination, and he filed a lawsuit alleging that Walmart wrongfully terminated his employment. Nasuti is no longer employed by Walmart.

As set forth above, Nasuti did not have a contract of employment and he has failed to show that retaliation was a reason for his termination. For all of these reasons, Nasuti has failed to demonstrate the existence of a genuine issue of material fact on his claims. Accordingly, Nasuti's renewed motion for summary judgment is denied.

For all of the reasons set forth above,

**IT IS ORDERED t**hat Plaintiff Matt Nasuti's renewed motion for summary judgment is denied, (Doc. 93), and Walmart's motion for summary judgment is granted, (Doc. 95).

Dated this 15ᵗʰ day of November, 2021.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK